UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : CRIMINAL NO. 3:21-CR-143 |
| v. | : (JUDGE MANNION) |
| JEREMY EDWARD JOHNSON, | : |
| Defendant. | : |

## MEMORANDUM

Following a jury verdict finding the defendant guilty on two counts of the Indictment, Jeremy Johnson (hereinafter "Johnson"), filed a motion for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. (Doc. 169). The defendant essentially contends that he is entitled to a judgment of acquittal since the government failed to present sufficient evidence at trial from which a reasonable juror could conclude, beyond a reasonable doubt, that he was guilty of all counts in which he was charged.

For the reasons set forth below, defendant's motion, (Doc. 189), will be **DENIED IN ITS ENTIRETY**.

I. **BACKGROUND**[1]

Briefly, the present case commenced on July 25, 2022 with the jury returning a guilty verdict on both counts on August 3, 2022. The defendant was found guilty of Count 1 of the Indictment, a conspiracy to distribute and possess with intent to distribute controlled substances (fentanyl and heroin) resulting in death, in violation of Title 21 U.S.C. §846 and §841; and, Count 2 of the indictment, distribution of a controlled substance resulting in death in violation of Title 21 U.S.C. §841(a)(1). (Doc. 1).

On August 17, 2022, the defendant moved for acquittal, or, in the alternative, for a new trial. (Doc. 169). Defendant's motion has been fully briefed and is ripe for the court's decision. (Docs. 170, 187, and 190).

---

[1] Since the complete procedural background of this case is stated in the court's July 8, 2022 Memorandum which addressed co-defendant Nickas' motion for a discovery disclosure timetable, (Doc. 112), it is not repeated herein. An additional factual background of the case is also contained in PSP trooper Nicolas De La Iglesia's narrative Offense Report, (Doc. 79-5), and in the Affidavit of Probable Cause in support of the March 11, 2021, search warrant for Nickas' cell phone data filed by Monroe County Detective Kim Lippincott, (Doc. 96-2). This stated background is incorporated herein by reference.

## II. STANDARD OF REVIEW

### A. Rule 29 Motion for Judgment of Acquittal

"On a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, the court must decide whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial." United Sates v. Delgado, 367 F. Supp. 3d 286, 291 (M.D. Pa. 2019), aff'd 827 Fed.Appx. 180 (3d Cir. 2020), (citing United States v. Caraballo-Rodriguez, 726 F.3d 418, 431 (3d Cir. 2013) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); United States v. Freeman, 763 F.3d 322, 343 (3d Cir. 2014)). Further, "[t]he court must view the evidence in a light most favorable to the prosecution and must deny the motion 'if there is substantial evidence ... to uphold the jury's decision.'" Id. (citing Caraballo-Rodriguez, 726 F.3d at 430 (quoting United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003)). The court is required to "draw all reasonable inferences in favor of the jury's verdict", and, "a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" United States v. Smith, 294 F.3d 473, 476–77 (3d Cir. 2002) (internal citations omitted). Thus, the court "must uphold the jury's verdict unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable

- 3 -

doubt." United States v. Fattah, 914 F.3d 112, 183 (3d Cir. 2019) (citation omitted).

"Under this highly deferential standard of review, it is not the court's task to 'act as the thirteenth juror,' weigh credibility, assign weight to evidence, or 'substitute [its] judgment for that of the jury.'" Delgado, 367 F.Supp.3d at 291 (citations omitted). "The decision to overturn a conviction based on insufficient evidence may only be made 'where the prosecution's failure is clear,' United States v. Leon, 739 F.2d 885, 890 (3d Cir. 1984) (quoting Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)), or where the verdict 'fall[s] below the threshold of bare rationality,' Caraballo-Rodriguez, 726 F.3d at 431." Id. "Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges." United States v. Garner, 915 F.3d 167, 169 (3d Cir. 2019) (citation omitted).

### B. Rule 33 Motion for a New Trial

Rule 33(a) provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). "Granting or denying a motion for a new trial 'lies within the discretion of the district court.'" Delgado, 367 F.Supp.3d at 291 (citing United States v.

Cimera, 459 F.3d 452, 458 (3d Cir. 2006)). "A court evaluating a Rule 33 motion does not view the evidence favorably to the government but instead must 'exercise[ ] its own judgment in assessing the Government's case.'" Id. (citing United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002)). "[E]ven if the court believes that the verdict is contrary to the weight of the evidence it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred— that is, that an innocent person has been convicted.'" United States v. Silveus, 542 F.3d 993, 1005 (3d Cir. 2008) (citation omitted). Further, "Rule 33 motions are disfavored and should be 'granted sparingly and only in exceptional cases.'" Delgado, 367 F.Supp.3d at 291 (citations omitted). "Exceptional cases include those in which trial errors 'so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" Id. (citing United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993)).

### III. DISCUSSION

#### A. Motion for Judgment of Acquittal

Johnson challenges the sufficiency of the evidence regarding the distribution and conspiracy charges against him, i.e., no reasonable trier of fact could have found that Johnson distributed or conspired to distribute the

- 5 -

drugs that caused the death of Joshua Kiernan. (Doc. 170 p.7). Johnson argues that the only evidence presented by the government that could potentially link him to the drugs or drug bags found on Kiernan at his time of death stem from the unreliable testimony of Kaleigh Watson. Johnson additionally alleges that there was no direct link created between him and the drug bags stamped with "Rite Aid." Similarly, Johnson contends that the connection between him and the unlabeled bag is unreliable. The defendant attacks the credibility of Watson based on one cell site location data point that indicated she was not at the home where she said she was located. The government counters that the ample evidence and witnesses provided are more than sufficient evidence from which a reasonable juror could conclude beyond a reasonable doubt that Johnson conspired to distribute and possess with intent to distribute controlled substances (fentanyl and heroin) resulting in the death Kiernan and distribution of a controlled substance resulting in the death of Kiernan.

As the court instructed the jury in its charge, (Doc. 156 p.58-59), in order for you to find a defendant guilty of conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of federal law, you must find that the government proved beyond a reasonable doubt each of the following three (3) elements:

**First:** That two or more persons agreed to distribute or possess with the intent to distribute a controlled substance, heroin and/or fentanyl. I will explain the elements of this offense to you shortly. I instruct you as a matter of law that heroin and fentanyl are controlled substances within the meaning of the federal drug laws.

**Second:** That the defendant was a party to or member of that agreement; and

**Third:** That the defendant joined the agreement or conspiracy knowing of its objective to distribute and possess with the intent to distribute a controlled substance, and intending to join together with at least one other alleged conspirator to achieve those objectives; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve those objectives.

Next, the court instructed the jury in its charge, (Doc. 156 p.72-73), in order to find the defendants guilty of this offense in Count 2, you must find that the government proved each of the following four elements beyond a reasonable doubt:

**First:** That the defendants knowingly and intentionally distributed a controlled substance;

**Second:** That the controlled substances distributed by the defendants were heroin and fentanyl;

**Third:** That Joshua Kiernan used the heroin and fentanyl distributed to him by the defendants; and

**Fourth:** That the use of the heroin and fentanyl by Joshua Kiernan was a cause without which the death of Joshua Kiernan on December 11, 2020 would not have occurred.

At trial, the government introduced hundreds of text communications between Johnson and Susan Nickas. (Gov't Ex. 80). The government also introduced a number of Facebook communications between Kiernan and Johnson evidencing the regular purchases that Kiernan made from Johnson. (Gov't Ex. 14.13). The government placed the operation on full display for the jury with messages showing Kiernan would make a request for drugs from Johnson, Johnson would check with Nickas, Nickas would confirm availability, and Johnson would then inform Kiernan he had a supply. The evidence introduced at trial displayed hundreds of days of Johnson and Nickas working together to obtain, possess, and sell controlled substances. The government offered communications between Nickas and Johnson instructing each other to "call your guy" or "get your guy" portraying the

shared sources such as "Jerm Dude" (identified as Jamondre Jones), (Gov't Ex. 81), and "Conny Tech," (Gov't Ex. 93).

The government offered Facebook messages indicating that Kiernan did not have drugs in his possession when he went to work on December 10, 2020 and testimony that he was a daily drug user. The plan was for Watson to purchase drugs from Johnson and bring them to Kiernan's worksite for him around lunch. (Gov't Ex. 14.13). Communications between Watson and Kiernan on the morning of December 10, 2020 were evidence at trial and admitted as Gov't Ex. 14.14. Watson testified that she purchased drugs from Johnson the day prior to Kiernan's death. Watson stated that the drugs she received from Johnson were in unstamped bags, which was unusual. Watson then took out an additional $200 from a Sunoco gas station where she filled up her car with gas and provided approximately $170 dollars as pre-payment for additional drugs Johnson would acquire later that day. Watson explained that she was waiting with Johnson at a McDonald's for "Sue" to be ready.[2] Watson then said someone picked up Johnson, who she presumed was "Sue." This series of events was corroborated by ATM receipts from Watson's account showing her removing money from her

---

[2] Sue was the name Watson would use to reference co-defendant Susan Nickas in this exchange.

account to pay Johnson and get gas, (Gov't Ex. 11.01 and 11.02); text messages from Johnson to Nickas stating that he was "just getting gas now," and cell site location analysis conducted and testified to by FBI Special Agent John Orlando, (Gov't Ex. 60). Cell site location analysis from Special Agent Orlando also showed Nickas and Johnson traveling from the Stroudsburg area together for a period of time to Paterson, New Jersey to attain more drugs and then return to Pennsylvania at approximately 6:30 p.m. (Gov't Ex. 60). Text messages between Nickas and "R" also explained that she was on her way to Paterson and "R" was directing her to the meet location on December 10, 2020. (Gov't Ex. 77). No text messages were exchanged between Johnson and Nickas during the time their phones were moving from the Stroudsburg area to the Paterson area, which suggests the two were traveling together.

After receiving the drugs in Paterson, Johnson communicated with Kiernan several times in order to arrange for Kiernan to receive the drugs Watson had paid for earlier that day. (Gov't Ex. 60).

Kiernan arrived home from work and ate dinner with Watson at approximately 6:58 p.m. (the breadcrumbs reports Gov't Ex. 4 and 5). After leaving work on December 10, 2020, Kiernan continued to communicate with Johnson about attaining the prepaid drugs. Through cell site location

analysis, the government demonstrated Johnson and Kiernan's cell phones moving from the Stroudsburg area toward Johnson's residence in Reeders, Pennsylvania. The two phones remained in the same area for a period of time until Kiernan's phone then returned to his residence at approximately 1:30 a.m. Kiernan's phone remained at home until he left for work the next morning with the drugs he received from Johnson earlier that morning and the drugs Watson received from Johnson on the previous day. (Gov't Ex. 60).

After Kiernan arrived home and they ate dinner, Watson testified that Kiernan then left the residence as it was his usual habit to meet up with Johnson for more drugs. Kiernan left to pick up the prepaid drugs. Watson described Kiernan's meetings with Johnson as his "second job" because it was nearly an everyday occurrence. When Kiernan returned with drugs after meeting up with Johnson, he and Watson used again. The government proved at trial that within Watson's drug kit, which she explained was where she stored her most recently used and unused drug bags, law enforcement found used unstamped white bags and used bags stamped with "Rite Aid." These were the same type of used and unused bags found alongside Kiernan's body in his drug kit at the scene of his death. There were no other used or unused drug bags found on Kiernan body other than those obtained

from the Johnson/Nickas conspiracy. This series of events also again corroborated Watson's testimony that she shared the drugs she purchased on December 10, 2020 with Kiernan and then Kiernan shared the drugs he received during the early morning hours of December 11, 2020 with Watson.

The defendant challenges the testimony of Watson on the grounds of unreliability based upon a single instance where Watson stated she was at home, but her cell site location information indicated she was at another location. As the court instructed, it was the jury's role to evaluate the credibility of all the witnesses who testified at trial, including Watson. A reasonable juror could have certainly concluded that Watson's testimony was credible, based in part on the various consistencies with receipts, text messages, and cell site location information. If the jury found Watson not credible, they could have also concluded she was unreliable and not believed her testimony. See United States v. Lacy, 446 F.3d 448, 451 (3d Cir. 2006) (holding that the court, when deciding a motion for judgment of acquittal, must "view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences"). In light of the verdict, the jury believed the testimony of Watson. This court

will not overturn the verdict of the jury pertaining to the credibility determination.

Next, the defendant argues that there was a lack of evidence linking him to the specific drug bags that killed Kiernan. The defendant argues this by pointing to Kiernan getting drugs from Chris Pugh several days before his death. (Doc. 190 p.4). However, as the government's evidence indicated, Kiernan did not have any drugs on his way to work on December 10, 2020. Watson's testimony and communications with Kiernan indicate that she was going to purchase drugs from Johnson to bring to Kiernan because he was a daily user without any supply with him while at work. It was certainly reasonable for the jury to have concluded that because Kiernan did not have any drugs on him on December 10, 2020, then the only drugs he received were from Johnson either through Watson purchasing drugs from Johnson on December 10, 2020 or from Kiernan meeting up with Johnson in the early morning hours of December 11, 2020. Furthermore, Watson's testimony about her drug kit containing her most recently used drug bags coupled with matching bags found alongside Kiernan's body showcase that Watson and Kiernan shared the same supply of drugs. The defendant's arguments about a lack of evidence linking the two used bags of drugs to him fails to take into account the testimony of Watson, the communications between Johnson and

Kiernan, and the cell site location analysis. Additionally, the defendant fails to account for the overall scheme the government illustrated through numerous text messages, Facebook messages, and cell site location analysis. The evidence sufficiently shows that the jury had a reasonable basis to conclude, beyond a reasonable doubt, that Johnson distributed and conspired to distribute drugs that resulted in the death of Joshua Kiernan.

### B. Rule 33 Motion for New Trial

As an alternative to his motion for judgment of acquittal, Johnson moves for a new trial. Johnson contends that he is entitled to a new trial because the evidence presented at trial does not support the verdict.

The defendant does not raise separate arguments for the motion for a new trial. The defendant again argues that the evidence is insufficient for the government to link Johnson to the unlabeled bags and to the "Rite Aid" stamped drug bags found on Kiernan at the time of his death. Additionally, the defendant challenges the credibility of Kaleigh Watson.

This is not an "exceptional case" warranting the granting of a Rule 33 motion. As was previously explained, the government offered a plethora of evidence illustrating the scheme to distribute as well as the conspiracy to distribute drugs that caused the death of Joshua Kiernan. As noted above,

the evidence offered by the government included hundreds of text messages between the defendant and Nickas (Gov't Ex. 80) and Facebook messages between the defendant and Kiernan (Gov't Ex. 14.13). These messages offered direct evidence of Johnson's involvement in the distribution and conspiracy to distribute drugs. The messages showed a pattern where Nickas and Johnson would coordinate the purchase of additional drugs from shared sources, which the government identified as "Jerm Dude" and "Conny Tech." (Gov't Exs. 81 and 93). These messages display a conspiracy and distributions that stretched hundreds of days. Additionally, the government offered cell site location analysis from FBI Special Agent John Orlando, (Gov't Ex. 60), and testimony from Watson corroborated these facts.

While Johnson attacks the credibility of Watson, her testimony was corroborated by multiples pieces of evidence offered by the government. For example, Watson's explanation of the events was corroborated by Facebook messages, ATM receipts, cell site location information, and the breadcrumbs reports. (Gov't Exs. 14.13, 14.14, 11.01, 11.02, 60, 4, and 5). These pieces of evidence support Watson's credibility in her testimony, as previously noted. The attack on Watson's credibility focuses on a single cell site location data point on a particular evening. After comparing the evidence offered by the defendant and the corroborating evidence offered by the government,

there is no basis to believe a miscarriage of justice, let alone a serious miscarriage of justice has occurred.

## IV.   Conclusion

In light of the foregoing, the defendant's motion for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33, (Doc. 169), will be **DENIED**.

An appropriate order will follow.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: December 13, 2022**
21-143-08